FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

02 AUG 21 PM 1:35

U.S. DISTRICT COURT
N.D. OF ALABAMA

BILLY G. CROOK,           )
                          )
      Plaintiff,          )
                          )         CIVIL ACTION NO.
                          )
v.                        )         00-AR-3423-J
                          )
SCHILBERG INTEGRATED METALS,  )
INC., et al.              )
                          )
      Defendants.         )

ENTERED
AUG 21 2002



**MEMORANDUM OPINION**

Before the court is a motion for summary judgment filed by
defendants, Schilberg Integrated Metals, Inc., GMP Metals, LLC.
and SIMCO Group, Inc.[1](collectively "GMP").

Plaintiff, Billy G. Crook ("Crook"), prays for relief under
Titles I and IV of the Americans with Disabilities Act ("ADA").
Crook alleges that GMP discriminated against him because of his
disability and engaged in retaliation via termination when Crook
informed Schilberg he was qualified to return to work after Crook
was required to be on medical leave due to his disability.   For
the reasons set forth below, GMP's motion is due to be granted.

**I. STATEMENT OF UNDISPUTED MATERIAL FACTS**

Crook is an individual with a disability as the term is

---

[1]Defendant Schilberg Integrated Metals ("Schilberg")filed a
separate motion for summary judgment claiming that it was not
plaintiff's joint employer.  That motion is moot.  Schilberg
joined GMP and SIMCO in this motion for summary judgment.

defined under the ADA. Crook suffers from Type II diabetes mellitus.  He has experienced numerous health problems related to his diabetes.[2]

In 1983, Crook became plant manager for Gerald Metals ("Gerald") at its Bear Creek, Alabama facility. In 1999, GMP Metals purchased the Bear Creek plant and took over operations. Crook was hired as the plant manager of GMP's Bear Creek facility on May 13, 1999. At both GMP and Gerald, Al Sirignano ("Sirignano"), Vice President of Operations and President of the GMP Division of Gerald, supervised Crook.

As plant manager Crook was responsible for hiring and firing employees, overseeing day to day operations such as maintenance and safety control, meeting with customers, setting up transportation, conducting performance reviews and record keeping. The GMP Bear Creek facility operated 24 hours per day at least 5 days a week. The plant manager position was a full time position with typical working hours as Monday through Friday, approximately 7:15 a.m. to 4:30 p.m.  Crook had the highest ranking position at the plant and his annual salary was $96,000.

---

[2]Crook also suffers from diabetic neuropathy, or tingling/paresthesias in his hands and feet. He suffers from high blood pressure, sleep apnea and cardiovascular disease, including congestive heart failure and coronary artery disease. Crook also has significant vision loss in each eye because of diabetic retinopathy. During Crook's employment with Gerald he had some absences due to his medical conditions. He was never told that the plant was suffering due to his absences.

Crook contends that it was not necessary for him to be present at the plant during all working hours. However, GMP argues that the plant manager had to be at the facility or on call and available at a moment's notice at all times the facility was in operation. Crook concedes that it is preferable to be physically present at the plant to manage operations instead of attempting to do so from a remote location.

During Crook's absences, Troy Sumner performed the plant manager's duties. Crook also performed Sumner's duties when Sumner occasionally left work early to officiate high school and college basketball games.

In early July, 1999 Crook experienced kidney failure which ultimately necessitated surgery in order to allow Crook to undergo dialysis. Since July 1999 Crook has suffered from end-stage renal disease and he must remain on dialysis for the rest of his life. He started dialysis on October 1, 1999 and until July 2000 Crook was on a strict dialysis Monday, Wednesday, Friday schedule.[3] The dialysis was scheduled to last approximately five and half hours. GMP asserts that the total

---

[3]Some facilities offered a Tuesday-Thursday-Saturday schedule with early morning hours. Other centers offered a 24 hour schedule. These alternative schedules were not discovered until after this litigation was initiated. These alternatives as it relates to reasonable accommodations will be discussed later in this opinion.

time needed for dialysis would be 7 hours.[4]  Crook contends that
dialysis could be completed in 4 hours.  However, Crook did
indicate on an application for long term disability benefits that
the dialysis would take 7 hours per trip three days a week.

On July 7, 1999 Crook was taken off work by his doctors due
to kidney failure.  Through September 13, 1999 Crook remained off
work receiving accrued vacation pay.  Once vacation pay was
exhausted Crook received salary continuation.  On September 13,
1999 Crook was approved for short term disability under GMP's
benefit plan.

Sometime after his departure in July of 1999 Crook notified
Sirignano of his need to be off during August to prepare for
dialysis.  When asked about his future ability to work, Crook
responded that one doctor had told him dialysis means retirement
and another doctor had told him it may or may not mean
retirement.  No definite time periods were given.  In September
of 1999 Crook was approved for paid disability leave due to his
continued renal failure problems.[5]

---

[4]This estimation includes the time Crook would be hooked up
to the machines, plus clean up time and travel time.

[5]Between August 1999 and the end of September 1999, Crook
and his supervisor did not communicate about Crook's leave.
However, Sirignano was aware that Crook had applied for short
term disability. Crook contends that his application for short
term disability benefits put GMP on notice that he would return
after the disability benefits ended in three months. But he never
communicated his intentions to GMP. On his short term benefits
application the employer noted that the employee's expected date

During Crook's absence Troy Sumner, plant superintendent, acted as plant manager.  After Crook had been out of work for three months, GMP officially placed Sumner in the plant manager position.

On November 15, 1999, Sirignano, Crook's supervisor, and Bernard Schilberg, the vice president of SIMCO, asked Crook to meet with them.  At this time, Crook informed Sirignano for the first time that he would be ready to return to work and that he would be able to provide them with a medical release.  However, Crook admits that he did not have a release to return to work from any doctor at that time or any time thereafter.  Crook's doctor testified that she would have denied his request.

There is some dispute as to what was actually said at this November meeting.  Crook alleges that GMP told him is services were no longer needed and that he should worry about his health and not returning to work.  GMP also told Crook to apply for Social Security disability benefits and long term disability benefits.  A reasonable accommodation was not discussed at this meeting.  Crook claims he was in shock when they told him he was no longer needed and did not remember anything else that was said.  Schilberg drove Crook home after the meeting.  According to Crook, on the drive home Schilberg told Crook that they would

---

to return to work was undetermined. Although it was GMP and not Crook that answered this question it is still an indication that GMP did not know when Crook planned to return.

not hang him out to dry.

In his deposition, Sirignano testified that the sole reason for replacing Crook with Sumner was to salvage and/or establish stability in the workforce at GMP. According to Sirignano, GMP employee's, most of who had worked for Gerald prior to the sale, were concerned that GMP had purchased the Bear Creek facility to shut it down. Sirignano stated that as they approached the end of the summer of 1999 and Crook had been absence most of that time he had to make a decision. He was aware that Crook had been out of work for about three months and was suffering from a condition which he had indicated may mean retirement. Sirignano did not know when Crook planned on returning but did know he was receiving short term disability benefits. Sumner was fulfilling the obligations of plant manager as well as his own job as plant superintendent. Sirignano testified that he had been optimistic up until that point that "there was a rainbow. And that at some point in time Bill would be able to get on top of his health problems." Sirignano stated that employee's concerns were exacerbated by the new owner's failure to make capital expenditures to update the facility. Sirignano was also concerned that employees were noticing Crook's absence and that GMP was doing nothing to replace him, leaving a power vacuum at the top which could be seen as a lack of interest at the Bear Creek facility. He contended that he had seen an exodus of

6

employees and feared more would leave if something was not done to demonstrate GMP's commitment to the Bear Creek facility. He never told Crook about these concerns.

On November 18, 1999 Crook filed his application for Social Security disability benefits.  On his Social Security disability application Crook represented that he was unable to work because of various health problems.  He represented that he had difficulty with paperwork due to his eyesight and that he suffered from dizziness.  He also responded that he was physically unable to work because of his kidney problems and dialysis.  In regards to Social Security disability benefits, Crook was already considered  disabled because of his end stage renal disease.

In February of 2000, Crook applied for long term disability benefits under a Hartford plan and then under a Unum plan.[6] Crook's doctor indicated in the application that Crook was unable to work and could only perform daily life activities. Crook's application was turned down by both plans.

In February of 2000 Crook called GMP wanting to cash out his 401(k) plan with GMP.  The plan could not be cashed out without Crook's employment being terminated.  Through a letter dated

---

[6]In order for Crook to be covered under GMP's new disability plan with Hartford, Crook was brought back to work for one day in December 1999 so that he could be considered an "active employee" for coverage purposes.

February 23, 2000 GMP agreed to terminate Crook's employment effective February 28, 2000.

On March 7, 2000, Crook filed his EEOC charge against Schilberg, but not GMP or SIMCO, claiming that Schilberg had discriminated against him because of his disability by failing to reinstate him to the plant manager position.  Crook amended his charge on July 31, 2000, approximately 258 days after he claimed he was terminated, to add a claim of retaliation. Crook alleges that Schilberg interfered with his right to return to work with a reasonable accommodation from medical leave related to his disability.

## II. DISCUSSION

The general purpose of the ADA is to eradicate discrimination against persons with disabilities. *See* 29 C.F.R. § 1630.1(a)(1999).  The ADA's express and narrow purpose is to provide equal, not preferential, opportunities to disabled persons.  *See Terrell v. USAir*, 132 F.3d 621, 627 (11th Cir. 1998).  To establish a *prima facie* case of employment discrimination based on his alleged disability under the ADA, the plaintiff must demonstrate that he: (1) has a disability; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of his job; and (3) the defendant unlawfully discriminated against him because of his disability. *See Holbrook v. City of Alpharetta*, 112 F.3d 1522 (11th Cir.

8

1997).

Crook alleges that GMP violated the ADA when they replaced him as plant manager in September/October of 1999 and when they refused to allow him to return to work in November of 1999. Each claim will be discussed separately.[7]

**A. Crook's Claim That GMP Discriminated Against Him When GMP Replaced The Plant Manager In The Fall Of 1999.**

### 1. Crook's *Prima Facie* Case

Both parties concede that Crook is a person with an actual disability, as the term is defined under the ADA. Thus, there remains a dispute as to whether GMP unlawfully discriminated against Crook because of his disability and whether Crook is qualified as the term is defined under the ADA. To demonstrate that he is protected by the ADA, Crook has the burden of demonstrating he could perform the plant manager job at GMP either with or without a reasonable accommodation. If he cannot do so, GMP is entitled to summary judgment as a matter of law. *See Gordon v. E.L. Hamm & Assoc.*, 100 F.3d 907, 915 (11th Cir.

---

[7]This court will treat Crook's allegations as two separate claims. In footnote 23 of Crook's brief Crook states that he is challenging GMP's action in replacing him, as well as GMP's failure to allow him to return to work with a reasonable accommodation of allowing a flexible schedule. On page 47 of Crook's brief he argues that a disparate treatment analysis does not apply in cases wherein the plaintiff alleges discrimination via defendant's failure to accommodate. The court will rely on Crook's footnote and assume he is making two allegations. Therefore, the court will apply the McDonnell-Douglas burden shifting method of proof to Crook's first allegation.

1999).

First, GMP contends that Crook cannot demonstrate that he is qualified because he cannot adequately explain his sworn statements in his social security application that he is disabled and unable to work. In some cases an earlier SSDI claim may turn out genuinely to conflict with an ADA claim. Summary judgment is appropriate when "the plaintiff fails to make a showing sufficient to establish the existence of an element essential to his case, and on which he will bear the burden of proof . . . [a]nd a plaintiff's sworn assertion in an application for disability benefits that [he] is, for example, "unable to work" will appear to negate an essential element of [his] ADA case—at least if [he] does not offer a sufficient explanation. *See Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 119 S.Ct. 1597 (1999).

On his Social Security disability application Crook represented that he was unable to work because of various health problems. He stated that he had difficulty with paperwork due to his eyesight and that he suffered from dizziness. He also responded that he was physically unable to work because of his kidney problems and dialysis.

Crook contends that these statements were not inconsistent with his ADA claims because the SSDI application does not take into consideration reasonable accommodations. Furthermore, in

10

regards to Social Security disability benefits, Crook was already
considered disabled, regardless of whether he was working,
because of his end stage renal disease.  Moreover, like the
plaintiff in *Cleveland,* Crook's statements were accurate in the
time period in which they were made.  When he signed his social
security application, he was still disabled, as defined under the
Social Security Act, although he *may* have been able to work with
a reasonable accommodation.

Although Crook has offered sufficient explanations for his
inconsistent statements on his Social Security disability
application the court's analysis does not end here.  GMP has
offered several other reasons why Crook is not qualified.

GMP claims that Crook is not a qualified individual because
he simply could not perform the essential functions of the plant
manager job with any known reasonable accommodation.  Thus, the
question before the court is whether Crook's leave of absence
disqualifies him under the ADA as able to perform his job.

The ADA requires that, in determining what job functions are
essential, "consideration shall be given to the employer's
judgment." *Holbrook c. City of Alpharetta*, 112 F.3d 1522, 1526
(11th Cir. 1997).  Further, the ADA advises the court in making
its essentialness inquiry to consider: "(1) the reason the
position exists is to perform the function; (2) there are a
limited number of employees available among whom the performance

11

of the job function can be distributed; and (3) the function is highly specialized so that the incumbent in the position was hired for his or her expertise or ability to perform the particular function." Id.

Here, GMP contends that Crook cannot satisfy the essential functions of his job because regular attendance during the operating hours of the Bear Creek facility was an essential function of the job.[8] At the time he was replaced Crook had been absent for three months, and GMP had no indication of when he would return. The Eleventh Circuit has held that in addition to possessing the required skills necessary to perform the essential job function, an employee must be able to demonstrate those skills by reporting to work on a regular basis, thereby making attendance an essential function of most jobs. *See Jackson v. Veterans Admin.*, 22 F.3d 277 (11th Cir. 1994). The plant manager job was a full-time job that required the presence of the plant manager.[9] It was the highest paid and most important job at the

---

[8]Relying on *Turnes v. Amsouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994), Crook argues that GMP cannot rely on after acquired evidence to prove that Crook is not qualified. However, in *Turnes,* the court held that an employer may not use after-acquired evidence as part of its non-discriminatory business reason. The court did not address the issue present in this case of whether defendants can use after-acquired evidence to prove that the plaintiff is not qualified. It is not necessary for the court to address this issue because there is additional sufficient evidence that renders Crook unqualified.

[9]GMP contends presence is an essential function so that the plant manager can be available at a moments notice, direct

12

Bear Creek facility. Although GMP did not object to Crook's earlier leave of absences, Troy Sumner had to perform the plant manager's duties when Crook was absent. Crook himself contended that on site management is preferred.

A reasonable accommodation does not require that an employer wait indefinitely for an employee's medical condition to improve. *See Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998). Crook had not informed GMP that he was ready to return until it called him in November. When asked about his future ability to work, Crook responded that one doctor had told him dialysis means retirement and another doctor had told him it may or may not mean retirement. No definite time periods were given.

Crook was also not "qualified" because he did not have a medical release to return to work. Again, an employee who cannot meet the attendance requirements of the job cannot perform the essential functions of the job and cannot be considered a qualified individual for purposes of the ADA. In *Duckett v. Dunlop Tire Corp.*, 120 F.3d 1222, 1225 (11th Cir. 1997), the court held that because the employee had never received and could not have received a physician's release to return to work at the

———————————

supervisors in the processing operation, ensure conformance with quality requirements and scheduling, contact and meet customers regarding sales, maintain traffic/transportation control, perform management function such as job assignments and operate plant vehicles.

time he was replaced and later allegedly terminated, he simply cannot demonstrate he was a "qualified individual with a disability." Crook claims that his doctor told him that he could return to work when he felt better. When would he feel better? He never supplied GMP with a medical release nor did he ask his doctor for one even though he knew he needed one.  Crook's doctor also testified that she would have denied his request.

Crook argues that he is "qualified" because he could perform the essential functions of the job with a modified work schedule. Crook requested a modified schedule that would allow him to continue his strict dialysis Monday, Wednesday, Friday schedule. The dialysis was scheduled to last approximately five and half hours.  Under this schedule, Crook would not be able to be at the plant a substantial portion of the three out of five work days each week due to his dialysis schedule.  Crook, however, did produce some evidence that he would have been able to change his dialysis schedule to after work and weekends.  In that instance, the schedule may constitute a reasonable accommodation but it does not change the fact that Crook was not "qualified" for the reasons discussed above.[10]  Since Crook cannot prove that he is a "qualified individual with a disability" GMP is entitled to

---

[10]The parties briefly discussed the issue of the reasonable accommodation of a vacant position. It appears as though Crook abandoned that issue.  Furthermore, the evidence clearly proves that there was not a vacant position available.

summary judgment as a matter of law.

### 2. GMP's Legitimate Non-discriminatory Business Reason

Assuming *arguendo* that Crook can prove his *prima facie* case, GMP is still entitled to summary judgment because it has presented uncontroverted evidence that its decision was made for legitimate, non-discriminatory business reasons.

There are two methods of proof for demonstrating alleged discrimination: (1) direct proof of discriminatory intent; or (2) indirect proof, or the burden-shifting method.  Here, Crook solely attempts to prove discrimination through the indirect burden-shifting method.[11]  The mechanics of proving discrimination pursuant to the indirect burden-shifting analysis are well-settled: If the plaintiff establishes a *prima facie* case, there is a rebuttable presumption of discrimination, and

---

[11]Crook claims that the comments made at the November 1999 meeting between Crook, Schilberg and Sirgnano constitute direct evidence. This court disagrees. Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption. Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998). "Only the most blatant remarks, whose intent could be nothing other than to discriminate . . ."' will constitute direct evidence of discrimination." Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081-82 (11th Cir. 1990). If the evidence presented is subject to more than one possible meaning it is not direct evidence. Harris v. Shelby County Bd. Of Educ., 99 F.3d 1078, 1082-83 n.2 (11th Cir. 1996). Crook offers as direct evidence of discrimination the comments that Crook's services were no longer needed and that Sirignano's response in his deposition that a reasonable accommodation "was not a subject on the table." This evidence is merely circumstantial evidence.  Thus, the *McDonnell-Douglas* burden shifting analysis applies.

the employer must offer a legitimate, nondiscriminatory or non-retaliatory reasons for the adverse employment action.  The employer's burden is merely one of production; it need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.  If the employer gives a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff must prove this reason is mere pretext for discrimination.

GMP argues that it is entitled to summary judgment on Crook's claim arising from replacement of him as plant manager because GMP had a legitimate business reason for its decision.  GMP contends that it replaced Crook to salvage and/or establish stability in the workforce at GMP.  According to Sirignano, GMP employees, most of whom had worked for Gerald prior to the sale, were concerned that GMP had purchased the Bear Creek facility to shut it down.  Sirignano stated that as they approached the end of the summer of 1999 and Crook had been absence most of that time, he had to make a decision.  He was aware that Crook had been off work for about three months and was suffering from a condition which he himself had indicated may mean retirement.  Sirignano did not know when Crook planned on returning but did know he was receiving short term disability benefits.  Sumner was

fulfilling the obligations of plant manager as well as his own job as plant superintendent. Sirignano testified that he had been optimistic up until that point that "there was a rainbow. And that at some point in time Bill would be able to get on top of his health problems." Sirignano stated that his and his fellow employees' concerns were exacerbated by the new owner's failure to make capital expenditures to update the facility. He was concerned that employees were noticing Crook's absence and that GMP was doing nothing to replace him, leaving a power vacuum at the top which could be seen as a lack of interest at the Bear Creek facility. He contended that he had seen an exodus of employees and feared more would leave if something was not done to demonstrate GMP's commitment to the Bear Creek facility.

Here, GMP has articulated a legitimate, non-discriminatory reason for the challenged action. If the defendant offers a legitimate, non-discriminatory reason the presumption of discrimination is eliminated and the plaintiff must come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude the reasons given by the employer were not the real reasons for the adverse employment decision. *See Chapman v. AI transport*, 229 F.3d 1012, 1024 (11th Cir. 2000)(en banc)(quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). "If the plaintiff fails to

17

proffer sufficient evidence to create a genuine issue of material fact as to whether each of the defendant's proffered reasons is pretextual, the defendant is entitled to summary judgment." Id. At 1024-25.

Crook argues that GMP made its decision based on its assumption of his prognosis and not on his actual abilities.  GMP never articulated its above stated reasons to Crook. Crook states that GMP just assumed that he was not returning to work and never contacted him or any of his doctors upon which to base this decision.  Crook also offers as evidence of pretext: 1) Sirignano's statement that he had assumed that plaintiff's returning to work was "not a probability" and that was the mind-set he was operating under, 2) Sirignano's statement "the issue was not a subject on the table" to the question of whether a reasonable accommodation was discussed at the November meeting when they terminated him, 3) the fact that GMP did not articulate these morale and stability reasons to Crook when they terminated him, 4) the reasons given are contrary to GMP's response to the EEOC charge and 5) the fact that GMP encouraged Crook to apply for long term disability benefits.[12]

---

[12] Crook requests that the court "reject any attempt by defendants to ignore the overwhelming case law which indicates it is an employer's obligation to ensure that employment decisions are based on something other than assumption and speculation." Yet Crook did not provide any case law to support this assertion. Crook also argues it was the employer's obligation to contact Crook's doctor to inquire about his prognosis or actual ability.

Sirignano's comments do not indicate that he was making a decision based purely on his assumptions regarding Crook's condition.  He never said that he would never talk about a reasonable accommodation. Rather, he indicated that the subject was not brought up by either party.  Furthermore, Crook never asked for a reasonable accommodation. Sirignano was operating under the reasonable mind set that Crook would not return to work, not because of Crook's disability but because of the fact that Crook had already been absent three months and his return to work was not anticipated within a foreseeable period of time. Crook never contacted GMP about his return to work.

In the EEOC charge response GMP discusses Crook's absence and states that it did not terminate Crook until he demanded that his employment be terminated.  This reply to the EEOC charge did not mention the November meeting.  This is not contrary to what GMP has said in its briefs.  It testified that it replaced him in November but officially terminated him in February so that he

_____

Again, Crook offers no case law to support this position. In response to this latter argument, GMP relies on the fact that the ADA specifically prohibits inquiries into an employee's medical status unless such inquiry is shown to be job related and consistent with a business necessity. Arguably, an inquiry here would be job related. However, GMP points out that the statute provides an employer "may make inquiries into the ability of an employee to perform job-related functions" and that the use of the word may suggests that an employer is not required to seek such information. Furthermore, even if GMP had talked to Crook's doctors they would not have released him for work and GMP would still have Sumner performing the plant manager's duties.

19

could cash out his 401(k).  GMP also stated in its reply to the
EEOC charge that "It became apparent because of his deteriorating
physical condition, i.e. severe diabetic condition, combined with
deteriorating sight as a consequence thereof, dialysis three
times a week, that he was unable to carry forward his duties as
plant manager, he could not manage the plant unless he was there,
and he was not there for most of the time."  This statement is
wholly consistent with the reasons proffered for Crook's
termination in GMP's briefs.

Finally, the fact that GMP encouraged Crook to apply for
Social Security benefits and long term benefits does not raise a
genuine issue of material fact as to its motives for termination
of Crook's employment. GMP testified that at the meeting in
November it discussed Crook's health and disability benefits.
The purpose of the ADA is not to hold employers liable for
discrimination for merely discussing disability benefits or
encouraging disabled employer's to seek disability benefits.
This statement does not raise a genuine issue of material fact as
to whether GMP was actually motivated to replace Crook because of
his absence and the stability and morale of the plant.  This
evidence is simply not sufficient to convince a reasonable jury
that GMP's proffered, non-discriminatory reasons for his
termination were pretextual.

**B. GMP Discriminated Against Crook By Refusing To Allow Him To Return To Work In November Of 1999.**

Crook claims that GMP violated the ADA when it failed to provide him with a reasonable accommodation. Crook contends that courts have consistently upheld modified work schedules as reasonable accommodations.  While this may be true, the main issue at this point is whether Crook actually asked for a reasonable accommodation.

In *Gatson v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999), the Eleventh Circuit held that "the duty to provide a reasonable accommodation is not triggered unless a *specific* demand for an accommodation has been made is binding precedent for purposes of defining the scope of the duty to provide a reasonable accommodation under the ADA."  Thus, the initial burden of requesting an accommodation is on the employee. *Id.*  GMP argues that Crook never made a specific request for any accommodation that would allow him to perform the essential functions of the job.

Crook argues that he requested the reasonable accommodation of a leave of absence, which defendant approved.  Although this is true, the employee is the best position to know what accommodation is needed.  If the type of accommodation needs to be changed, as it did in this case, the employee bears the burden

of informing the employer of the change.  Crook never asked for
an accommodation in the form of a modified work schedule to meet
his dialysis schedule.

Even if this is a situation where GMP should have known or
did know this accommodation was necessary or that an
accommodation was requested, the accommodation Crook now suggests
would not have been reasonable.  GMP approved the initial leave
of absence but Crook never requested a modified work schedule.
Furthermore, this court cannot find that it is a reasonable
accommodation to allow Crook to show up for work two out of five
days of the work week.

It is also too late to raise the suggested accommodation of
an after-work and weekends dialysis schedule.  *See Fussell v.
Georgia Ports Authority*, 906 F.Supp. 1561 (S.D. Ga. 1995), *aff'd*.
106 F.3d 417 *(11th Cir. 1997)*. The significant aspect of ADA
claims is discrimination in the workplace while the employee is
on the job.  *Id*.  The employee must show that he requested an
accommodation while he was on the job and that the employer
refused.  *Id*.  Otherwise, the employee could think up new
accommodations years later while in the midst of litigation.  *Id*.
This would place a burden on the employer to think of an
accommodation at the time of the request even if the employee did
not think of it.  *Id*.

The only accommodation that Crook suggested which could have

22

allowed him to perform the essential functions of the job was not even known by Crook until after this litigation began. Therefore, Crook cannot demonstrate that GMP failed to provide him with a reasonable accommodation and GMP is entitled to summary judgment as a matter of law on this claim.

## C. Retaliation

First, GMP argues that it is entitled to summary judgment as a matter of law on Crook's retaliation claim because Crook failed to exhaust his administrative remedies by failing to file a timely charge of discrimination with regard to this claim.

In order to be timely, the EEOC charge must be filed within 180 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e5(e)(1). Crook alleges that GMP retaliated against him by interfering with his right to work with a reasonable accommodation. GMP argues that the most recent alleged retaliation took place in November of 1999 approximately 264 days before he filed his amended charge, and therefore is untimely. However, a charge may be amended to cure technical defects or omission, and such amendments alleging additional acts that constitute unlawful employment practices directly related to or growing out of the subject matter of the original charge will relate back to the original filing date. 29 C.F.R. § 1601.1.12(b)(2001). In this case, Crook's amended charge, which added a claim of retaliation, grows out of the same subject

matter contained in his original charge and is therefore timely.

In order to make out a *prima facie* case of retaliation, a plaintiff must show (1) statutorily protected expression; (2) adverse employment action; and (3) a causal link between the protected expression and the adverse action. *Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278 (11th Cir. 1997).

Crook engaged in a statutorily protected activity by requesting a reasonable accommodation in the form of short-term medical leave. Crook also suffered an adverse employment action when his employment was terminated a short time later. Thus, the question before the court is whether there exists a causal link between the protected expression and either adverse action. GMP has offered evidence that it was not retaliating against Crook for asking for a leave of absence but was rather trying to further accommodate him. For instance, GMP allowed him to miss work without consequence by giving him 15 extra days of unearned vacation days. It also discussed with Crook the possibility of obtaining long-term disability benefits under the GMP policy. Crook even testified that Schilberg told him that the company would not leave him out to dry.

Assuming *arguendo* that Crook has presented a *prima facie* case of retaliation Crook cannot refute the legitimate, non-retaliatory business reason offered by GMP for the employment decisions in this case. As discussed in the previous section, GMP

24

offered evidence that it replaced Crook because the plant needed stability and that Crook's leave of absence was of an undetermined period of time.  Crook argues that GMP's concerns about stability are mere self-serving speculation.  This argument does not provide a basis for a reasonable juror to find that the reason is mere pretext.  Crook's own opinion with respect to a causal link between his EEOC charge and his termination is far more speculative and self-serving that the reasons for Crook's termination proffered by GMP and already found not to have been pretextual. For the reasons stated above, GMP's motion for summary judgment is due to be granted on the retaliation claim.

<u>CONCLUSION</u>

This court, by separate order, will grant GMP's motion for summary judgment.


DONE this _2¹ⁿᵈ_ day of August, 2002.


_____
WILLIAM M. ACKER, Jr.
UNITED STATES DISTRICT JUDGE